Cory A. Baskin (SBN 240517)
cb@witkowlaw.com
witkow | baskin
21031 Ventura Boulevard, Suite 700
Woodland Hills, California 91364
Tel: 818.296.9508

Joshua L. Seifert (SBN 296399)
jseifert@seifertpllc.com
Joshua L. Seifert PLLC
175 Varick Street
New York, NY 10014
Tel: 646.470.2746

Attorneys for *Plaintiff* Michael Abe

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL ABE, an individual, | Case No. 20-8193 |
| Plaintiff, | **COMPLAINT; DEMAND FOR JURY TRIAL** |
| v. | |
| AFCH, INC., a California corporation; MICHAEL AMIRI, an individual; and DOES 1-10, inclusive, | |
| Defendants. | |

**COMPLAINT**

Plaintiff Michael Abe ("Abe") brings the following Complaint for federal securities violations against Michael Amiri ("Amiri") and AFCH, Inc. ("AFCH"), and certain as yet unknown "Doe" co-conspirators, (Amiri, AFCH, and Does, collectively, "Defendants"):

## NATURE OF THE ACTION

1. On June 3, 2019, Amiri announced that Italian billionaire, Renzo Rosso ("Rosso"), owner of the Diesel fashion brand and numerous other luxury labels through his Only the Brave ("OTB") holding company, had purchased a significant minority stake in AFCH. Although the financial terms of the deal were not reported, information began to leak out indicating that Rosso had invested as much as $40 million in the AMIRI brand based upon a $100 million valuation of the company.

2. This news came as a surprise to Abe, AFCH's former Vice President, who, mere months before, had been persuaded by Amiri to sell his entire 5% stake of AFCH shares back to the company (and, effectively, Amiri himself) for only $1 million.

3. This $1 million sale price was based upon a supposedly independent valuation of AFCH commissioned by Amiri, purportedly in good faith, using financial information provided by AFCH to the appraiser, which determined that AFCH was only worth $30 million.

4. After the Rosso deal was announced, however, Abe had good cause to suspect that he had been defrauded by Amiri and AFCH into accepting $1 million for his shares, when their actual value was likely closer to $4 or $5 million.

5. Abe attempted to raise his concerns about his stock buyout to Amiri via letter in September 2019. But, rather than provide any evidence to support the paltry appraisal of Abe's shares or refute the reported financial terms of the Rosso deal, Amiri and his team of lawyers instead raced to the courthouse to file a lawsuit *against Abe*, accusing him, in exceedingly broad and spurious fashion, of misappropriating AFCH's trade secrets. *See AFCH, Inc. v. Michael Abe*, Los Angeles County Superior Court Case No. 19STCV33144 (the "State Court Case").

6. Seemingly flush with cash following Rosso's investment, and seemingly unaffected – like the *uber* rich who can afford to wear his astonishingly expensive streetwear – by the economic realities of the Covid-19 pandemic, Amiri's filing of the State Court Case was a transparent and cowardly ploy designed to intimidate Abe into dropping his claims of financial malfeasance against Amiri and his company.

7. Uncowed, Abe has filed a Cross-Complaint in the State Court Case, alleging causes of action against AFCH and Amiri for California securities violations, fraud, breach of fiduciary duty, breach of contract, breach of the implied covenant of good faith and fair dealing, and unfair competition.

8. Having only recently discovered significant additional facts regarding the nature and scope of his former employer's financial shenanigans, Abe now also files this action to preserve his claims for federal securities violations which could not be asserted in the State Court Action due to the exclusivity of federal jurisdiction over such claims.

## PARTIES

9. Abe is an individual residing in the County of Los Angeles. He was employed by AFCH from 2014 until his resignation as of February 14, 2018.

10. Upon information and belief, Defendant Amiri is an individual residing in the County of Los Angeles.

11. Upon information and belief, Defendant AFCH is a California corporation with its principal place of business in the County of Los Angeles. Until its May 2019 name change, AFCH's corporate name was Atelier Fashion Company, Inc. ("Atelier"). At all times relevant to this Complaint, AFCH was privately held and its shares were not sold on any public market.

12. Upon information and belief, Amiri is, and at all relevant times was, the Creative Director of AFCH and its namesake fashion line, AMIRI.

13. Abe is ignorant of the true names, capacities, relationships and extent of participation in the conduct herein alleged of the cross-defendants sued herein as Roes

1 through 10, inclusive, but on information and belief alleges that said cross-defendants are legally responsible for it. Abe will amend this Cross-Complaint to allege the true names and capacities of the Roe cross-defendants when ascertained.

14. Abe is informed and believes, and on that basis alleges, that except as otherwise alleged herein, each Defendant is and at all times relevant to this Complaint was, the employee, agent, employer, partner, joint venturer, alter ego, affiliate, and/or co-conspirator of the other Defendants and, in doing the acts alleged herein, was acting within the course and scope of such position at the direction of, and/or with the permission, knowledge, consent, and/or ratification of the other Defendants. In the alternative, Abe is informed and believes, and based thereon alleges, that each Defendant, through its acts and omissions, is responsible for the wrongdoing alleged herein and for the damages suffered by Abe.

## JURISDICTION AND VENUE

15. This Court has personal jurisdiction over Defendant Amiri because he is a resident of California.

16. This Court has personal jurisdiction over Defendant AFCH because its principal place of business is in California.

17. Personal jurisdiction is also proper because Defendants consented to the sole and exclusive jurisdiction of the federal and state courts of California in connection with various agreements with Abe related to this dispute.

18. This Court has subject matter jurisdiction pursuant to Section 27 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), 15 U.S.C. § 78aa.

19. Venue is proper in this Court pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1391 because the parties consented to jurisdiction of the federal and state courts of California.

## FACTUAL ALLEGATIONS

20. Abe is a veteran fashion designer who has partnered with some of the biggest names in the industry.

21. In 2014, Abe partnered with Amiri to provide his valuable expertise and unique insight into the fashion industry to expand AFCH's fledgling business and its flagship brand, AMIRI.

22. At the outset, Amiri promised to grant Abe a substantial equity stake in AFCH. During the following years and as a direct result of the tireless efforts of Abe alongside Amiri, AFCH grew to become a coveted luxury fashion brand.

23. Indeed, over the course of 2015 and 2016, Amiri repeatedly promised to provide Abe with a substantial equity stake in AFCH and repeatedly referred to Abe as his "partner" and key person who was instrumental in the success of AFCH.

24. Finally, on January 1, 2017, Abe and AFCH memorialized Abe's employment relationship with Atelier. Abe also received equity in AFCH through the execution of an Employment Agreement and Restricted Grant Stock Agreement ("RSGA"). A true and correct copy of the RSGA is attached hereto as **Exhibit 1**.

25. The RSGA awarded Abe 5,882 shares of Class B non-voting common stock, equal to 5% of AFCH's total stock. Amiri owned the remaining 95%.

26. This paltry grant was disappointing to Abe and far less than Amiri had previously promised. But Amiri knew the state of Abe's finances, and knew about his familial obligations to his wife and children. He took advantage of these circumstances to squeeze Abe for his own personal gain. Abe had no choice but to agree.

27. The AMIRI brand saw great success over the course of Abe's employment.

28. By July 2017, Abe and Amiri were actively seeking investors for AFCH, including Rosso and OTB.

29. In fact, AFCH engaged Rothschild & Co. ("Rothschild") to facilitate the sale of, or an investment in, AFCH, within six months. AFCH's retention of Rothschild coincided with negotiations with Rosso and OTB.

30. On July 28, 2017, OTB issued data requests to begin due diligence.

31. A month later, or about late August 2017, AMIRI made a presentation to Rothschild to help facilitate the sale of stakes in AMIRI (the "Rothschild Presentation").

32. The Rothschild Presentation identified AMIRI's creative team as consisting of two individuals: Mike Amiri and Michael Abe.

33. The Rothschild Presentation touted Abe's expertise and contributions, saying he "has been instrumental with AMIRI since [its] expansion beyond Maxfield in 2015, having taken the lead in business development, organization, and execution of strategy."

34. Regarding AMIRI's financials, the Rothschild Presentation stated:

> i. 2016 Actual EBITDA of $1,218,542
> ii. 2017 Projected EBITDA of $6,000,000
> iii. 2018 Projected EBITDA of $9,426,000

35. Subsequently, Rothschild indicated they believed AFCH was worth approximately $100 million and expected potential investors would agree.

36. In fact, upon information and belief, by November 2017, AFCH was in active negotiations on an investment transaction with Rosso/OTB premised on a valuation of AFCH at approximately $100 million.

37. By early 2018, however, Abe perceived that Amiri appeared less interested in finalizing a deal with OTB or securing an outside investor.

38. At that time, Abe was carrying an unsustainable workload for AMIRI, singlehandedly managing the company's operations.

39. As a result, on February 1, 2018, Abe provided AFCH with notice of intent to terminate his employment. He resigned two weeks later.

40. Just before Abe's resignation, on February 13, 2018, Amiri sent Abe a text message with a photograph of Amiri and Rosso.

41. Amiri told Abe that he was "working on something" and said, "[A]ny sign of discord will hurt us both." Abe responded, "I trust you." Amiri replied, "Yep. You should."

42. On March 1, 2018, in light of Abe's resignation from AFCH, which constituted a "Triggering Event" as defined in the RSGA, AFCH exercised its option

under the RSGA to repurchase 50% of Abe's 5% equity interest in AFCH, *i.e.*, 2,941 of Abe's 5,882 shares of AFCH, equal to 2.5% of AFCH.

43. Per paragraph 8(b) of the RSGA, the price paid by AFCH to repurchase 50% of Abe's AFCH stock was required to be "equal to the fair market value of the shares as of the end of the month immediately preceding the Triggering Event, as determined in good faith by the Board of Directors of the Corporation," except that, if Abe provides written notice of his disagreement with the Board's fair market value determination within 30 days of its provision to him, then AFCH is required to negotiate in good faith with Abe to resolve the valuation dispute. If the parties are unable to resolve their dispute in writing within the next 30 days, then "the Board of Directors of the Corporation shall select and retain a nationally recognized independent investment bank or valuation firm with expertise valuing business in the industries in which the Corporation operates (the "Appraiser") to determine the fair market value of the shares, whose determination (which shall be made in good faith) shall be final, binding and non-appealable."

44. At that time, and based upon, among other things, the Rothschild Presentation in which AFCH represented its value as approximately $100 million, Abe expected that his 2.5% of AFCH would be worth roughly $2.5 million.

45. However, rather than relying upon the valuation it was peddling to investors, when it came to valuing Abe's stock pursuant to the RSGA, AFCH's Board of Directors self-servingly elected to determine the purchase price of Abe's shares by reference to a separate valuation by Frank, Rimerman + Co. LLP that valued AFCH shares as of December 31, 2017 (the "FRC Valuation").

46. Importantly, the FRC Valuation had not been conducted to value Abe's equity. Rather, Amiri commissioned the FRC Valuation to value AFCH shares "to assist the management of [AFCH] with determining a fair market value price of the common equity in connection with granting stock options."

47. Specifically, AFCH had commissioned the FRC Valuation in connection

with the issuance of stock grants to Chad Shin, AFCH's CFO.

48. Shortly after the FRC Valuation was completed, Amiri told Abe that AFCH used intentionally conservative figures in the FRC Valuation, but that Abe's shares would be valued in a far less conservative manner consistent with a robust outlook for the company.

49. But Amiri did not follow through on his promise. Instead, contrary to his word, Amiri informed Abe that AFCH had elected to value the repurchase price for 50% of Abe's stock based on the FRC Valuation. Accordingly, AFCH informed Abe that Abe's 2,941 shares of AFCH stock were worth only $145.88 each, for a total of $429,033.08, just 1/5 of what Abe anticipated based upon the Rothschild Presentation, Abe's understanding of the negotiations with Rosso, and Abe's knowledge of AMIRI's business.

50. The financial figures used in the FRC Valuation were dramatically different than those AFCH presented to Rothschild just a few months earlier.

51. According to the FRC Valuation, AFCH's revenue figures were as follows:
  i. 2016 Actual Revenue of $7,223,000
  ii. 2017 Actual Revenue of $21,142,000
  iii. 2018 Projected Revenue of $31,252,000

52. In the FRC Valuation, the EBITDA figures were as follows:
  i. 2016 Actual EBITDA of $1,229,000
  ii. 2017 Actual EBITDA of $3,944,000
  iii. 2018 Projected EBITDA of $6,694,000

53. The FRC Valuation used the following companies as comparables: Aeffe S.p.A., Christian Dior SE, Prada S.p.A., LVMH Moët Hennessy Louis Vuitton S.E., Hermès International Société en commandite par actions, Michael Kors Holdings Limited, Kering SA, Tapestry, Inc., Salvatore Ferragamo S.p.A., Ted Baker PLC, Van de Velde NV, QUIZ plc, Vince Holding Corp., IC Group A/S, and Vera Bradley, Inc.

54. Based on the FRC Valuation's "Actual" 2017 EBITDA, and an EBITDA

multiple of 7.02, AFCH concluded that the company was worth just $28,300,000 as of January 31, 2018.

55. Because the figures used in the FRC Valuation were lower than those represented to Rothschild, because the FRC Valuation was significantly lower than the valuation reached by Rothschild, and because the FRC Valuation indicated a value far below the figure AFCH was negotiating with OTB, on March 30, 2018, Abe's counsel sent a notice to AFCH, advising that Abe was disputing the FRC Valuation pursuant to Paragraph 8(b) of the RSGA.

56. On or about April 20, 2018, AFCH provided Abe with financial data for his independent appraisal.

57. Abe and his independent appraiser, Vantage Point Advisors, Inc. ("Vantage Point"), had no choice but to rely upon AFCH's financials.

58. On May 4, 2018, Abe provided Atelier with an independent appraisal of his AFCH stock prepared by Vantage Point ("Abe Valuation").

59. The Abe Valuation considered the following financials, provided by AFCH:

    i. 2016 Actual Revenue of $7,223,046
    ii. 2017 Actual Revenue of $22,105,166
    iii. 2018 Projected Revenue of $31,252,000

60. Notably, these figures—which were based upon the financials provided by AFCH management—were different than the figures stated in the FRC Valuation.

61. The Abe Valuation considered the following financials, provided by AFCH:

    i. 2016 Actual EBITDA of $1,228,000
    ii. 2017 Actual EBITDA of $5,297,189
    iii. 2018 Projected EBITDA of $4,949,100

62. To determine the applicable EBITDA multiple, the Abe Valuation considered the following comparable companies: Aeffe S.p.A., Burberry Group plc,

Christian Dior SE, Hermès International Société en commandite par actions, Kering SA, LVMH Moët Hennessy Louis Vuitton S.E., Michael Kors Holdings Limited, Prada S.p.A., QUIZ plc, Salvatore Ferragamo S.p.A., Tapestry, Inc., and Van de Velde NV. These comparable companies were nearly identical to those used in the FRC Valuation.

63. To the 2017 Actual EBITDA, the Abe Valuation applied an EBITDA multiple of 10X to 11X.

64. To the 2018 Projected EBITDA, the Abe Valuation applied an EBITDA multiple of 9X to 10X.

65. These figures produced a value for AFCH ranging from $63,250,000 to $72,480,000.

66. Based upon the financials provided by AFCH, the Abe Valuation conservatively valued AFCH at $66,790,000 as of January 31, 2018, and valued Abe's 50% stake in AFCH (*i.e.*, 2,941 shares of AFCH stock ) at $418.29 per share, for a total of $1,230,186, more than 3X the FRC Valuation.

67. In response, rather than negotiate with Abe in good faith to resolve the valuation dispute as required under paragraph 8(b) of the RSGA, AFCH instead hatched a fraudulent scheme to coerce Abe to sell *all* of his shares back to AFCH (not just the 50% authorized under the RSGA as a result of Abe's resignation) at far below their fair market value.

68. On May 14, 2018, AFCH sent a cease and desist letter to Abe that declared, "Your secret it out. We are on to you." AFCH inexplicably and unfoundedly accused Abe of illegally diverting opportunities from AFCH, contacting suppliers, producers, and customers for the purpose of launching an independent and competing product line, misusing, and disclosing AFCH's trade secrets, and theft from AFCH. Based upon these wild allegations, AFCH asserted that it had the right repurchase *all* of Abe's shares in AFCH.

69. Confronted with AFCH's threats to effectively ruin his life by burying him with legal fees to defend against frivolous claims and crippling his ability to earn a

living in the fashion industry, Abe ultimately agreed to AFCH's demands to repurchase all of his stock and sever all ties with the company.

70. However, because the RSGA only provided AFCH with the right to repurchase 50% of Abe's shares, AFCH devised a new Stock Purchase Agreement, dated as of August 20, 2018, to govern its repurchase of all 5,882 of Abe's shares of AFCH (the "SPA"). A true and correct copy of the SPA is attached hereto as **Exhibit 2**.

71. Pursuant to the terms of the SPA, AFCH agreed to purchase all of Abe's 5,882 shares of AFCH stock at the greater of (a) $1,000,000 or (b) the fair market value of the shares as determined, in good faith, by an "Appraiser" (as defined in the RSGA) in accordance with section 8(b) of the RSGA.

72. Amiri signed the SPA on behalf of AFCH.

73. Unbeknownst to Abe prior to entering into the SPA, on or about May 25, 2018, just after sending the aforementioned threatening letter to Abe, AFCH secretly commissioned Sorbus Advisors LLC ("Sorbus") to conduct another valuation of Abe's shares (the "Sorbus Valuation").

74. AFCH never disclosed the Sorbus Valuation to Abe. Abe first learned of the existence of Sorbus Valuation only a few days ago on September 4, 2020, as a result of third-party discovery in the State Court Case.

75. As the contents of the Sorbus Valuation are currently subject to a Protective Order in the State Court Case, Abe is not presently at liberty to publicly disclose its specific details.[1] Nevertheless, without disclosing further specifics, Abe can confirm that Sorbus used different comparables than those in the FRC Valuation and Abe Valuation to render its valuation and determined that the fair market value of Abe's 5,882 shares, as of January 31, 2018, was significantly *greater* than $1 million.

---

[1] At the Court's request, Abe would be happy to submit a copy of the Sorbus Valuation under seal for the Court's *in camera* review. Obviously, AFCH and Amiri are fully aware of the Sorbus Valuation.

76. If Abe had known about the Sorbus Valuation at the time he entered into the SPA, he would have, at a minimum: (a) known that Amiri intended to value his shares using different comparables than those in the FRC Valuation and Abe Valuation; (b) insisted on different procedures than those set forth in the SPA to determine the value of his AFCH stock; and (c) demanded more than $1,000,000 as the minimum purchase price.

77. After the execution of the SPA, AFCH unilaterally selected Armanino LLP ("Armanino") to conduct what was to be the binding appraisal of Abe's shares based upon financial information unilaterally selected and provided by AFCH to Armanino. Indeed, per the terms of the agreement between AFCH and Armanino, Armanino was "liable only to Atelier," and AFCH agreed to indemnify Armanino for any claims made in connection with the valuation.

78. Further, undisclosed to Abe, AFCH engaged in confidential communications with Armanino concerning the valuation designed to influence the valuation.

79. Abe, by contrast, had no opportunity to communicate with Armanino or otherwise ensure that the information provided to Armanino was true and accurate.

80. Instead of honoring the parties' mutual understandings, and Amiri's prior representations to Abe, AFCH conspired to ensure that the Armanino Valuation produced an artificially low result, by, among other things, directing Armanino to apply the wrong analytical framework, submitting inaccurate financials to Armanino, instructing Armanino to use non-comparable companies, and providing Armanino with the FRC Valuation and Sorbus Valuation for reference and comparison, but not the Abe Valuation.

81. On or about September 5, 2018, Armanino issued its valuation of Abe's 5% stake in AFCH (the "Armanino Valuation") to Amiri.

82. Armanino expressly stated in the Armanino Valuation that it had not audited or reviewed the underlying data provided by AFCH, and "[a]ccordingly, we

take no responsibility for the underlying data presented or relied upon in this report."

83. At AFCH's instruction, the Armanino Valuation treated the "fair market value" and "fair value" of Abe's 5% equity interchangeably, even though Armanino acknowledged that "these two standards of value are distinct." Thus, on its face, the Armanino Valuation breached the SPA, which required an independent "fair market value" determination. Moreover, upon information and belief, if Armanino had applied the correct analysis, it would have reached a valuation similar to the Abe Valuation.

84. Abe is further informed and believes based upon Armanino's internal communications obtained pursuant to subpoena in the State Court Case that it "aimed" for its valuation to yield results similar to those of the FRC and Sorbus Valuations. Based upon these communications, Abe is informed and believes that, had AFCH also provided Armanino with the Abe Valuation, this too would have impacted the Armanino Valuation and resulted in a higher valuation of Abe's stock.

85. Moreover, at AFCH's instruction, Armanino used January 31, 2018 as the valuation date for Abe's shares. Although January 31, 2018 was required to be the valuation date for *50%* of Abe's shares under the RSGA based upon his resignation date from AFCH, neither the RSGA nor SPA set January 31, 2018 as the valuation date for the repurchase of *100%* of Abe's shares. Accordingly, the valuation date for the sale *all* of Abe's 5,882 shares under the SPA should have been the effective date of the SPA, *i.e.*, August 20, 2018. Abe is informed and believes that AFCH's instruction to Armanino to value Abe's shares as of January 31, 2018 instead of August 20, 2018 also unfairly reduced the share price determined in the Armanino Valuation.

86. The Armanino Valuation also used financial figures for AFCH that were either inaccurate or different than the figures previously presented to Abe and touted by AFCH.

87. First, the Armanino Valuation represented that the 2017 Actual Revenue was $21.136 million, which was nearly $1 million less than the $22,105,166 figure AFCH previously reported to Abe.

88. Second, the Armanino Valuation failed to consider the actual figures from January 2018, which demonstrated that the Projected 2018 EBITDA provided by AFCH was false. The Armanino Valuation stated the 2018 Projected EBITDA was $5,093,000. But the actual January 2018 EBITDA was $948,000. If that figure were annualized, the 2018 Projected EBITDA would have been $11,376,000, not $5.1 million.

89. Third, the Armanino Valuation was premised on an incorrect forecast of $31,252,000 in revenue. In January 2018, AFCH's revenue was $3,752,000. Annualizing that figure, the 2018 revenue was expected to be $45 million, not $31,252,000. In fact, in or about January 2018, AFCH represented to The New York Times, that it projected its sales to reach at least $40 million in 2018.[2] And that is precisely what happened: AFCH's revenue in 2018 exceeded $40 million.

90. Fourth, the Armanino Valuation considered numerous non-comparable companies, including Aritzia Inc., Differential Group Inc., Perry Ellis International Inc., and Sequential Brands Group Inc. The Armanino Valuation also inexplicably omitted Christian Dior SE, Prada S.p.A., LVMH Moët Hennessy Louis Vuitton S.E., Hermès International Société en commandite par actions, Kering SA, Tapestry, Inc., and Salvatore Ferragamo S.p.A., which were directly comparable brands that had been used in both the FRC Valuation and the Abe Valuation.

91. Indeed, AFCH instructed Armanino to omit LVMH Moët Hennessy Louis Vuitton S.E., Hermès International Société en commandite par actions from the list of comparable companies—even though those companies had been included in the FRC Valuation and the Abe Valuation.

92. Applying an EBITDA multiple of 6.5, which was derived by using incomparable companies, to the 2018 Projected EBITDA, which was premised on inaccurate financials, Armanino concluded that AFCH was worth $31,700,000

---

[2] See Matthew Schneier, "Are You Ready to (Dress Like YOU) Rock," The New York Times, January 18, 2018, available at: https://www.nytimes.com/2018/01/18/fashion/mike-amiri-los-angeles.html.

14
**COMPLAINT**

($5,093,000 x 6.5), and valued Abe's 5,882 shares of AFCH stock at $161.52 per share, for a total of $950,060.

93. AFCH also knew or should have known that the Armanino Valuation was incorrect. It was significantly lower than the undisclosed Sorbus Valuation, and 62% less than the Abe Valuation.

94. Furthermore, upon information and belief, AFCH and OTB were in talks throughout 2018 to sell a minority stake in AFCH premised on a valuation of approaching $100 million, more than 3X the Armanino Valuation.

95. Upon information and belief, AFCH failed to disclose the on-going talks with OTB to Armanino, causing Armanino to issue an inaccurate valuation. Such information and belief is based upon disclosures recently provided by Armanino to Abe pursuant to subpoena in the State Court Case, which do not indicate any disclosures to Armanino regarding OTB.

96. On June 3, 2019, it was reported that Rosso and/or OTB had acquired a minority stake in AFCH (the "Rosso Purchase"), though the amount was not publicly reported.

97. Thereafter, on or about August 1, 2019, Abe learned from various sources that Rosso had acquired his minority stake for $40 million, implying a valuation on par with the $100 million valuation reached by Rothschild in late 2017 and far in excess of the $32 million valuation in the Armanino Valuation.

98. Even though such information was material to the Armanino Valuation, AFCH and Amiri wrongfully withheld the information from their hand-selected appraisers.

99. Furthermore, when AFCH and Amiri received the Armanino Valuation, they knew or should have known that it dramatically undervalued AFCH and Abe's shares.

100. Thus, despite their fiduciary duties and obligations to act in good faith, AFCH and Amiri did not conduct the valuation provided under the SPA in good faith.

Among other things, they used a valuation that they caused to be falsely low by using misleading financial projections and baseline information, and then failed to disclose ongoing negotiations with Rosso that would have revealed the falsity of the valuation to Armanino.

101. Even though the Rosso Purchase closed after the repurchase of Abe's shares, it was an expected event, and was the best, most relevant evidence of Atelier's fair market value.

102. AFCH's decision to ignore the best evidence and rely instead upon an Armanino valuation it knew to be false—and thereby grant itself a windfall—was the epitome of bad faith.

103. In light of the Rosso Purchase and the information and what Abe believed was reliable intelligence as to its broad financial terms, Abe retained counsel and issued a demand letter to AFCH on or about September 11, 2019.

104. True to form, AFCH responded to this demand by filing the State Court Case, falsely accusing Abe of unrelated misconduct, while refusing to provide Abe with any details of the Rosso Purchase.

**FIRST CAUSE OF ACTION**

For Violations of § 10(b) of the Exchange Act and Rule 10b-5

(Against all Defendants)

105. Abe repeats and realleges each of the foregoing allegations, as though fully set forth herein.

106. Abe's 5,882 shares of Class B AFCH common stock were securities within the meaning of the Exchange Act.

107. As the issuer and majority shareholder of AFCH stock, Defendants were Plaintiff's fiduciary under state and federal law.

108. Defendants committed a deceptive act in connection with their purchase of Abe's stock when they misrepresented material information, failed to disclose material information, and deceptively manipulated the stock price.

109. Among other things, Defendants failed to disclose the Sorbus Valuation to Abe, which was material to Abe's agreement to the terms of the SPA. If Abe had known about the Sorbus Valuation, he would have demanded a higher purchase price for his shares. Knowledge of the Sorbus Valuation also would have indicated to Abe that AFCH intended to use different comparables than those in the FRC Valuation and Abe Valuation, which also would have affected his agreement to sell all his AFCH shares.

110. Defendants also misrepresented the 2018 Projected Financials to Armanino in connection with the Armanino Valuation and failed to disclose the ongoing OTB negotiations with Armanino, and then used the Armanino Valuation—which they had manipulated to reflect a falsely low valuation of AFCH—to repurchase Abe's shares.

111. On information and belief, Defendants made these misrepresentations and omissions, and engaged in this deceptive conduct, with the intent to deceive Abe and to induce him to sell his AFCH stock for inadequate consideration. Defendants each had a motive and opportunity to commit fraud insofar as inducing Abe to sell his AFCH stock for inadequate consideration.

112. Defendants' fraud occurred in connection with the purchase or sale of a security insofar as Defendants' fraudulent misrepresentations and omissions induced Abe to sell all his AFCH Stock.

113. Abe reasonably relied on Defendants' misrepresentations and omissions when he agreed to the terms of the SPA.

114. As a direct and proximate result of Abe's reasonable reliance on Defendants' misrepresentations and omissions, he sold his AFCH stock at an artificially low price, thus causing him economic loss in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**

For Control Person Liability under § 20(a) of the Exchange Act

(Against Michael Amiri)

115. Abe repeats and realleges each of the foregoing allegations, as though fully

set forth herein.

116. Amiri owned, dominated, and controlled AFCH, which was responsible for the material misstatements, omissions, and fraudulent conduct that caused Abe's injury. Except for the 5% of AFCH stock owned by Abe, Amiri owned the rest.

117. Accordingly, Amiri was, directly or indirectly, a control person of AFCH for the purposes of Section 20(a) of the Exchange Act.

118. Amiri owned, dominated, and controlled AFCH and the individuals responsible for the material misstatements and omissions at issue in this dispute.

119. As a control person, Amiri is jointly and severally liable with and to the same extent as the controlled entity—AFCH—for its violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## PRAYER FOR RELIEF

Wherefore, Abe demands judgment:

(a) awarding Abe general and compensatory damages and/or equitable remedies in an amount to be determined at trial;

(b) awarding Abe restitution and/or disgorgement to the extent of Defendants' unjust enrichment or other ill-gotten gains;

(c) awarding Abe pre-judgment and post-judgement interest at the maximum legal rate;

(d) awarding Abe his costs and disbursements, including attorney's, accountant's, and expert witness's fees; and

(e) granting such other and further relief as the Court deems just and proper.

Dated:  September 8, 2020               Respectfully submitted,

                                        witkow | baskin

                                        Joshua L. Seifert PLLC

                                        By: /s/Cory A. Baskin
                                            Cory A. Baskin
                                         Attorneys for *Plaintiff* Michael Abe

## DEMAND FOR JURY TRIAL

Plaintiff Michael Abe hereby demands a jury trial as to all issues so triable in the present action.

Dated: September 8, 2020

Respectfully submitted,

witkow | baskin

Joshua L. Seifert PLLC

By: /s/Cory A. Baskin
    Cory A. Baskin
Attorneys for *Plaintiff* Michael Abe