O

# United States District Court
# Central District of California

| | |
|---|---|
| MICHAEL ABE, an individual,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>AFCH, INC., a California corporation; MICHAEL AMIRI, an individual; BRANDT MORI, an individual; KANGKYU CHAD SHIN, an individual; and DOES 1–10, inclusive,<br><br>　　　　　　　Defendants. | Case No. 2:20-CV-08193-ODW (PVCx)<br><br>**ORDER GRANTING MOTION TO DISMISS [40]** |

## I.　　INTRODUCTION

Plaintiff Michael Abe brings this lawsuit against Defendants AFCH, Inc. and Michael Amiri for federal securities violations. (*See* First Amended Compl. ("FAC"), ECF No. 30.) Defendants move to dismiss Abe's FAC under Federal Rule of Civil Procedure ("Rule") 12(b)(6). (Mot. Dismiss ("Motion" or "Mot."), ECF No. 40.) The Motion is fully briefed. (*See* Opp'n, ECF No. 48; Reply, ECF No. 55.) For the reasons that follow, the Court **GRANTS** Defendants' Motion.[1]

---

[1] Having carefully considered the papers filed in connection with the Motion, the Court deemed the matter appropriate for decision without oral argument. Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15.

## II. BACKGROUND

AFCH is a California corporation in the fashion industry and Amiri is its Chief Executive Officer and Creative Director. (*See* FAC ¶¶ 10–12.) Abe, a veteran fashion designer, partnered with Amiri to help expand AFCH's business. (*Id.* ¶¶ 25–26.) On January 1, 2017, Abe signed an employment agreement with AFCH, and the parties executed the Restricted Stock Grant Agreement, which awarded Abe 5% of AFCH stock, or 5,882 shares ("Grant Agreement"). (*Id.* ¶¶ 29–30, Ex. 1 ("Grant Agreement"), ECF No. 30-1.)

Later that year, AFCH retained Rothschild & Co. to value the company in anticipation of the sale of, or an investment in, AFCH. (FAC ¶¶ 33–34.) Rothschild valued AFCH at approximately $100 million ("Rothschild Valuation").[2] (*Id.* ¶ 43.) During this time, the fashion group Only the Brave ("OTB") was negotiating an investment in AFCH ("OTB Deal"). (*Id.* ¶¶ 1, 35–37.) In September 2017, AFCH reached a tentative agreement with OTB for an investment transaction premised on the $100 million valuation of AFCH. (*Id.* ¶¶ 44–46.) This tentative agreement fell through but negotiations were renewed in January 2018, with the investment again premised on a $100 million valuation of AFCH. (*Id.* ¶¶ 54, 56.)

In late February 2018, Abe resigned from AFCH and, pursuant to the terms of the Grant Agreement, AFCH chose to repurchase half of Abe's equity interest, or 2.5% of AFCH stock (i.e., 2,941 shares). (*Id.* ¶¶ 60–61.) The Grant Agreement provided that the purchase price of Abe's shares would be equal to the "fair market value of the shares as of the end of the month immediately preceding the Triggering Event." (Grant Agreement § 8(b).) Accordingly, the valuation date ("Valuation Date") for Abe's 2,941 shares was January 31, 2018. (FAC ¶ 63.) Based on the recent Rothschild $100 million valuation, Abe believed that his 2.5% was worth $2.5 million. (*Id.* ¶ 64.)

---

[2] Between 2017 and 2018, Rothschild estimated that AFCH was worth $100 million, as reflected in the Rothschild Summary Financials, the Rothschild Presentation, and the Rothschild Valuation Overview (collectively, the "Rothschild Valuations"). (FAC ¶¶ 37, 43, 83, 109.)

To value Abe's shares for the repurchase, AFCH relied on a valuation by Frank, Rimerman + Co. LLP (the "FRC Valuation"), even though Rothschild had affirmed its $100 million valuation within days of the Valuation Date. (*Id.* ¶¶ 65–66.) The FRC Valuation had been performed to comply with Internal Revenue Code 409A and not for the specific purpose of valuing Abe's shares. (*Id.* ¶¶ 67–68.) FRC valued AFCH at $28,300,000 as of December 31, 2017. (*Id.* ¶ 76.) This was based on a discounted the share price due to lack of share marketability and resulted in Abe's 2.5% equity being worth $429,033.08 instead of the $2.5 million he had anticipated. (*Id.* ¶ 69.)

Abe disputed the FRC Valuation and obtained an independent appraisal, the "Vantage Valuation." (*Id.* ¶¶ 80, 84.) To help facilitate this valuation, AFCH provided Abe with the company's March 2018 Budget, which had a Projected 2018 Revenue of $31.252 million. (*Id.* ¶ 79.) By comparison, the April 2018 Budget projected a Net Revenue of $38 million. (*Id.* ¶ 81.) Although AFCH had already updated the April 2018 Budget, it disclosed only the March 2018 version to Abe. (*Id.* ¶¶ 81–82.) When Abe requested "other 'budgets'/'forecasts' for 2018 in addition to what" AFCH had disclosed, AFCH's general counsel responded that the March 2018 Budget was "the most recent one that had been prepared." (*Id.* ¶¶ 84–85.) Based on the March 2018 Budget, Vantage valued AFCH at $66,790,000 as of January 31, 2018, with Abe's 2.5% equity worth $1,230,186. (*Id.* ¶ 94.)

Rather than negotiate with Abe regarding the differing valuations, Abe alleges that AFCH "instead hatched a fraudulent scheme to coerce Abe to sell *all* his shares back to AFCH . . . at far below their fair market value" by accusing Abe of trade secret violations and misconduct. (*Id.* ¶¶ 96–98 (emphasis added).) Abe ultimately agreed to sell back his entire 5% stake of 5,882 shares to AFCH. (*Id.* ¶¶ 116–17.) Accordingly, on August 20, 2018, the parties executed a new "Stock Purchase Agreement" ("SPA"). (*Id.* ¶ 118–19, Ex. 2 ("SPA"), ECF No. 30-2.) Under the SPA, AFCH would purchase all of Abe's AFCH stock at the greater of: (a) $1,000,000 or

(b) the fair market value of the shares as determined, in good faith, by an appraiser in accordance with the Grant Agreement. (*Id.*)

During this time, and prior to entering the SPA, AFCH separately commissioned the "Sorbus Valuation" to appraise Abe's shares. (FAC ¶ 99.) The Sorbus Valuation was based on the March 2018 Budget and AFCH's FRC Valuation, but AFCH did not disclose to Sorbus Abe's Vantage Valuation or any documents related to the Rothschild Valuations or ongoing OTB negotiations. (*Id.* ¶¶ 100–01.) Sorbus valued AFCH at $35.9 million and concluded that, as of January 31, 2018, Abe's 5,882 shares were worth $1.07 million. (*Id.* ¶ 104.)

Pursuant to the Grant Agreement and SPA, AFCH selected an independent appraiser to determine the fair market value of Abe's shares—Armanino, LLP. (*Id.* ¶¶ 128–29.) AFCH provided Armanino with the March 2018 Budget and financials that reflected a 2018 Projected Revenue of $31.252 million. (*Id.* ¶¶ 132–34.) AFCH also provided the FRC Valuation ($28.3 million) and the Sorbus Valuation ($35.9 million). (*Id.* ¶ 139.) AFCH did not disclose to Armanino the Vantage Valuation ($66.7 million), or any information or documents related to Rothschild Valuations ($100 million). (*Id.*) AFCH also did not disclose that it had been in negotiations with OTB since the summer of 2017 and that the OTB Term Sheet reflected a $100 million valuation. (*Id.* ¶ 141.) Despite this, Amiri signed an express affirmation on behalf of AFCH, representing that AFCH had provided Armanino with all information material to their valuation of AFCH. (*Id.* ¶ 156.) Abe alleges that "[t]his representation was patently false." (*Id.*)

Armanino valued AFCH at $31.7 million and determined that, as of January 31, 2018, Abe's 5,882 shares had a fair market value of $950,000. (*Id.* ¶¶ 151, 154.) On September 6, 2018, AFCH gave Abe a copy of the Armanino Valuation and shortly thereafter wired Abe $946,850, which was the purported fair market value of Abe's 5% equity stake less half of the cost of the Armanino Valuation. (*Id.* ¶¶ 158–59.)

The next year on June 3, 2019, AFCH and Amiri issued a press release announcing that OTB had acquired a minority stake in Amiri. (*Id.* ¶ 161.) In August 2019, Abe learned "from various sources" that OTB had paid $40 million for its minority stake in AFCH, implying at least a $100 million valuation of the company. (*Id.* ¶ 162.) Abe concluded that AFCH had used the Rothschild $100 million valuation and that AFCH had manipulated its financial information to reduce the purchase price of Abe's shares. (*Id.* ¶¶ 164–65.) Accordingly, in September 2019, Abe sent AFCH and Amiri a letter "expressing his concerns that the stock buyout had not been conducted in good faith." (*Id.* ¶ 166.)

On September 8, 2020, Abe filed his Complaint in this action against AFCH and Amiri asserting two claims for federal securities violations. (Compl. ¶¶ 105–19, ECF No. 1.) On June 1, 2021, the Court granted Defendants' motion to dismiss the Complaint with leave to amend, finding that Abe's allegations lacked sufficient particularity and failed to adequately allege scienter. (Order Granting Mot. 8, 13.) The Court advised Abe that, to survive another Motion to Dismiss, he "must allege a strong, cogent, and compelling inference of scienter and plead facts with particularity beyond mere information and belief." (*Id.* at 13.)

On June 21, 2021, Abe filed his First Amended Complaint ("FAC") asserting the same two claims under the Securities Exchange Act: (1) violations of § 10(b) and Rule 10b-5 (against all Defendants); and (2) Control Person Liability under Section 20(a) (against only Amiri). (*See* FAC ¶¶ 167–92.)[3] AFCH and Amiri now move to dismiss the FAC for failure to state a claim. (*See* Mot.)

---

[3] Abe's FAC also included claims against two new defendants, Brandt Mori and Kangkyu Chad Shin. (FAC 1.) Mori and Shin moved to dismiss or strike the FAC on grounds including that Abe's FAC exceeded the scope of permitted amendment by naming them. (*See* Shin Mot., ECF No. 41; Mori Mot., ECF No. 42.) The Court granted both motions and dismissed Mori and Shin; the Court held that Abe must seek leave to amend before adding new claims or parties. (Min. Order 2, ECF No. 63.) Mori and Shin are not parties to this action.

### III. LEGAL STANDARD

A court may dismiss a complaint under Rule 12(b)(6) for lack of a cognizable legal theory or insufficient facts pleaded to support an otherwise cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). To survive a dismissal motion, a complaint need only satisfy the minimal notice pleading requirements of Rule 8(a)(2)—a short and plain statement of the claim. *Porter v. Jones*, 319 F.3d 483, 494 (9th Cir. 2003). The factual "allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). That is, the complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

The determination of whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. A court is generally limited to the pleadings and must construe all "factual allegations set forth in the complaint . . . as true and . . . in the light most favorable" to the plaintiff. *Lee v. City of Los Angeles*, 250 F.3d 668, 679 (9th Cir. 2001). However, a court need not blindly accept conclusory allegations, unwarranted deductions of fact, and unreasonable inferences. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). When a district court grants a motion to dismiss, it should generally provide leave to amend unless it is clear the complaint could not be saved by any amendment. *See* Fed. R. Civ. P. 15(a); *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Leave to amend "is properly denied . . . if amendment would be futile." *Carrico v. City & County of San Francisco*, 656 F.3d 1002, 1008 (9th Cir. 2011).

### IV. DISCUSSION

Abe asserts two claims for federal securities violations: the first against AFCH and Amiri, for misrepresentations and omissions in connection with the purchase of Abe's AFCH stock, in violation of § 10(b) and Rule 10b-5 ("Claim One"); and the

second against Amiri for control person liability regarding the violations alleged in Claim One ("Claim Two"). (FAC ¶¶ 167–92.) Defendants move to dismiss both claims. (Mot. 7–9.)

### A. Claim One: Violations of § 10(b) of the Exchange Act and Rule 10b-5

Section 10(b) of the Securities and Exchange Act of 1934 makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Pursuant to this section, the SEC promulgated Rule 10b-5, which makes it unlawful, in connection with the purchase or sale of any security:

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading, or[,]
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person . . . .

17 C.F.R. § 240.10b-5. "Rule 10b-5 encompasses only conduct already prohibited by § 10(b)." *Stoneridge Inv. Partners v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008). "In a typical § 10(b) private action a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Id.*

#### 1. *Material Misrepresentations or Omissions*

In a private securities fraud case, a plaintiff must also comply with the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). These heightened pleading requirements are "no small hurdle for the securities fraud plaintiff." *Id.* Under the PSLRA, plaintiffs must "specify each statement alleged to have been misleading [and] the reason or reasons why the

statement is misleading." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 321 (2007) (alteration in original) (quoting 15 U.S.C. § 78u-4(b)(1)). And if an allegation regarding the misrepresentation or omission is made on information and belief, the complaint shall "state with particularity all facts on which that belief is formed." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009).

For an allegation to be pleaded with particularity, Rule 9(b) requires that it include an account of the "time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007). This requirement can be satisfied "by pointing to inconsistent contemporaneous statements or information (such as internal reports) which were made by or available to the defendants." *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1161 (9th Cir. 2009).

Here, Abe alleges that Defendants made several actionable misleading or false statements and omissions related to the value of Abe's repurchased shares. (*See* FAC ¶¶ 167–85.) Defendants argue that Abe's FAC lacks sufficiently particular allegations of falsity or deception. (Mot. 17.) The Court addresses Defendants' alleged misstatements and omissions in turn.

    *(i)    Misstatements*

For a misstatement to be actionable, the statement must be misleading as to a material fact. *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988). For a statement to be misleading, it "must be capable of objective verification." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018). For a fact to be material, there must be "a 'substantial likelihood' that a reasonable investor would consider it important in his or her decision making." *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 934 (9th Cir. 2003) (quoting *Basic Inc.*, 485 U.S. at 231).[4]

---

[4] Defendants do not directly challenge the materiality of the alleged misrepresentations and omissions. Accordingly, and given that questions of materiality "involv[e] assessments peculiarly within the province of the trier of fact," the Court declines to decide the issue of materiality on

First, Abe alleges that AFCH falsely represented it had provided Armanino with all information material to their valuation. (FAC ¶ 155–57.) "Falsity is alleged when a plaintiff points to defendant's statements that directly contradict what the defendant knew at that time." *Khoja*, 899 F.3d at 1008. Here, Amiri signed an express affirmation on behalf of AFCH to confirm that it had "provided all information material to the valuation to Armanino." (FAC ¶ 156). Yet, AFCH did not provide Armanino with the Vantage Valuation, the Rothschild Valuations, updated company financials, or any information related to ongoing negotiations with OTB. (*Id.* ¶ 180.) Because AFCH's affirmation directly contradicted what it knew at that time, Abe has sufficiently alleged that AFCH made a false statement.

Next, Abe alleges that Defendants provided Armanino with "false financials that were materially lower . . . than all prior and subsequent projections." (FAC ¶¶ 131–32). For a statement to be actionable, it must be false when made. *Feyko v. Yuhe Int'l, Inc.*, No. 11-cv-05511-DDP (PJWx), 2013 WL 816409, at *4 (C.D. Cal. Mar. 5, 2013). Here, Defendants sent Armanino an estimated 2018 revenue of $31.252 million, which reflected the projected figures from the March 2018 Budget. (FAC ¶¶ 79, 132.) At this time, the April 2018 Budget was complete and reflected estimated revenue that was nearly $7 million greater than the figure submitted to Armanino. (*Id.* ¶¶ 79, 83–84, 132.) However, this does not make the March 2018 Budget false; it merely makes it out of date.

In his Opposition, Abe alleges that AFCH's Chief Financial Officer, Shin, admitted in an email that the March 2018 Budget was incorrect and that Amiri confirmed his knowledge of this fact, but nevertheless directed Shin to provide only the incorrect March 2018 Budget to value Abe's shares. (*See* Opp'n 21.) However, these facts were not included in the FAC and a plaintiff may not amend his complaint "by briefs in opposition to a motion to dismiss." *Diamond S.J. Enter., Inc. v. City of*

---

Defendants' motion to dismiss. *See Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1178 (9th Cir. 2009) (alteration in original), *aff'd*, 563 U.S. 27 (2011).

*San Jose*, 395 F. Supp. 3d 1202, 1231 (N.D. Cal. 2019). Abe fails to plead why the March 2018 Budget was false when it was made, rather than merely out of date. Thus, Abe has not established that the disclosed financial projections were a false statement.[5]

Lastly, Abe alleges that Defendants misrepresented the selection of comparable companies to Armanino, so that Armanino would reach a lower valuation. (FAC ¶¶ 142–46.) When Armanino requested a list of comparable companies, AFCH specifically instructed against using the same brands that were previously listed as comparable companies in AFCH's prior, higher valuations. (*Id.*) Abe argues that AFCH's "manipulations of the comparable companies caused Armanino to reach an artificially low market multiple" and, ultimately, a lower valuation of Abe's shares. (*Id.* ¶ 146.) Nevertheless, Abe fails to explain how these differences in comparable companies makes them false or resulted in a lower valuation. "[T]o allege falsity, a plaintiff must set forth facts explaining why the difference between two statements 'is not merely the difference between two permissible judgments, but rather the result of a falsehood.'" *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 877 (9th Cir. 2012). Abe disputes the methodology used by Armanino but does not allege falsity. *See id.* Thus, these allegations regarding comparable companies do not concern false statements and cannot form the basis of a securities act claim.

        *(ii)    Omissions*

"[W]hen a plaintiff relies on a theory of omission, the plaintiff must allege 'facts going to the basis for the issuer's opinion . . . whose omission makes the

---

[5] Abe also argues that the PSLRA's safe harbor provision does not apply to exempt AFCH's varying financial projections as "forward looking statements." (Opp'n 22.) The PSLRA safe harbor applies "if the forward-looking statement is . . . identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014) (quoting 15 U.S.C. § 78u-5(c)(1)). Defendants do not directly argue that the safe harbor exempts AFCH's varying projected revenue figures and valuations. (*See* Mot.; Reply 8 n.7.) Accordingly, the Court declines to address the safe harbor provision's applicability.

opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.'" *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017) (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 194 (2015)). As the Supreme Court has cautioned, "[t]hat is no small task for an investor." *Omnicare*, 575 U.S. at 194. For an omission to be actionable, "it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).

Under Rule 10b-5, there is a duty "to disclose material facts that are necessary to make disclosed statements, whether mandatory or voluntary, not misleading." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 504 (9th Cir. 1992). Still, Rule 10b-5(b) and § 10(b) do not "create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011). Moreover, "[o]missions are actionable under [§ 10(b) and Rule 10b-5] only if the party omitting the fact had a duty to disclose that fact." *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1029–30 (C.D. Cal. 2008).

In addition, there is no requirement that, "once a disclosure is made, there is a duty to make it complete and accurate." *Brody*, 280 F.3d at 1006. Instead, securities laws "prohibit *only* misleading and untrue statements, not statements that are incomplete." *Id.* (emphasis in original). Accordingly, to survive a motion to dismiss under the heightened pleading standards of the PSLRA, "the plaintiffs' complaint must specify the reason or reasons why the statements made by [the defendants] were misleading or untrue, not simply why the statements were incomplete." *Id.*

Here, Abe alleges Defendants omitted various information that was material to both Armanino's analysis and Abe's decision to sell his AFCH stock. (FAC ¶¶ 139, 151, 173.) First, Abe argues that Defendants had a duty to disclose the OTB Term Sheet and did not. (Opp'n 10–11.) For support, he relies on *Melcher v. Fried*, in which a closely held defendant corporation repurchased shares based on a $4.8 million

valuation. No. 16-cv-2440-BAS (BGSx), 2018 WL 6326334, at *13 (S.D. Cal. Dec. 4, 2018). The defendant did not disclose that it was contemporaneously engaged in merger discussions and negotiating a term sheet premised on a $12 million valuation. *See id.* at *3, 13. The court in *Melcher* held that the relationship between the corporation and its shareholders gave rise to a duty to disclose the merger negotiations. *Id.* at *11.

Abe's reliance on *Melcher* is not persuasive given the context here, particularly the information available to Abe at the time of the alleged omission. Unlike the plaintiff in *Melcher*, Abe knew that AFCH was in discussions with OTB and that an acquisition was possible. (FAC ¶¶ 44–48, 57.) Abe also knew that Rothschild had valued AFCH at $100 million. (*Id.* ¶ 64.) Therefore, contrary to Abe's contention, he "'knew what he didn't know,' [and] there was nothing misleading in the omission" of the OTB Term Sheet. *See McCormick v. Fund Am. Cos.*, 26 F.3d 869, 880 (9th Cir. 1994) (quoting *Jensen v. Kimble*, 1 F.3d 1073, 1077–78 (10th Cir. 1993)). Accordingly, Abe fails to establish Defendants' duty to disclose the OTB Term Sheet.

Next, Abe alleges Defendants caused Armanino to undervalue Abe's shares by withholding the higher valuations, Vantage ($66.7 million) and Rothschild ($100 million), and disclosing to Armanino only the lesser valuations, FRC ($28.3 million) and Sorbus ($35.9 million).[6] (*See* FAC ¶¶ 139, 145–46.) Abe argues that, but for this omission, "Armanino would have appraised Abe's shares for significantly more." (Opp'n 24.)

The PSLRA requires that plaintiffs specify the reasons why a statement is false rather than "simply . . . incomplete." *Brody*, 280 F.3d at 1006. Abe does not explain why the Armanino Valuation is false. Further, Defendants contend that the Vantage Valuation was not disclosed because it was an outlier, which estimated AFCH's value to be more than $30 million greater than the estimates by Armanino, FRC, and Sorbus.

---

[6] AFCH did not provide these valuations to Armanino, even though Armanino specifically requested the "other value indications." (FAC ¶ 139.)

(Mot. 26.) Similarly, the Rothschild Valuations relied on a 2018 Projected Revenue of $40.9 million, whereas all the other valuations, including Armanino, reflected a 2018 Projected Revenue of $31.252 million. (FAC ¶¶ 72, 87, 110, 133.) Given the significant differences in the valuations, Abe must clearly allege why disclosure of the Vantage and Rothschild Valuations was necessary to prevent the disclosure of only the FRC and Sorbus Valuations from being misleading. *See City of Dearborn Heights*, 856 F.3d at 616. He has not done so. Accordingly, Abe fails to show that Defendants committed an actionable omission by withholding the Vantage and Rothschild valuations from Armanino.

Lastly, Abe alleges that Defendants failed to disclose information that was material to his decision to sell his AFCH stock, such as the OTB Term Sheet, the Rothschild Valuations, and the Sorbus Valuation. (FAC ¶¶ 182, 185.) Yet, Abe was aware that Rothschild had previously valued AFCH at $100 million. (*See id.* ¶ 44.) And Defendants disclosed the Sorbus Valuation to Armanino, who appraised Abe's shares, even if they did not disclose this valuation directly to Abe. (*Id.* ¶ 139). Further, Sorbus had access to even less information than Armanino, as AFCH provided Sorbus with only the FRC Valuation, further diminishing the significance of the Sorbus Valuation. (*Id.* ¶ 101.) Given this context, Abe has not established that the omitted valuations call into question Armanino's basis for valuing AFCH or Abe's decision to sell his stake in the company. *See City of Dearborn Heights*, 856 F.3d at 616. Thus, Abe fails to allege an actionable omission.

### 2. Scienter

Although Abe fails to allege an actionable omission, he has sufficiently alleged a false statement. Accordingly, the Court proceeds to the element of scienter.

Under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc.*, 551 U.S. at 319. Accordingly, to sufficiently plead that the

defendants acted with scienter, "a complaint must 'allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness.'" *Zucco Partners*, 552 F.3d at 991. Further, to allege that a defendant omitted information with scienter, a plaintiff must plead "a highly unreasonable omission" that involves something more than even inexcusable negligence. *Id.* The omission must be "an extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.*

Under the PSLRA, the Court must view the pleading in its entirety and compare allegations of scienter with other plausible explanations for the allegedly false or misleading statements, to determine whether there is a "cogent and compelling," "strong inference" of scienter. *Tellabs, Inc.*, 551 U.S. at 322–24; *Zucco Partners*, 552 F.3d at 991–92. "The relevant inquiry is 'whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" *In re VeriFone*, 704 F.3d at 701 (quoting *Tellabs, Inc.*, 551 U.S. at 323)). Moreover, the Court "must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs, Inc.*, 551 U.S. at 324.

Here, Defendants have provided several plausible, nonculpable explanations for their misstatements and nondisclosures. (*See* Mot. 26.) For example, Defendants maintain that AFCH did not disclose details about the OTB Deal because Abe already knew about this possible investment by virtue of his past employment with AFCH. (*Id.*) Also, although the Vantage Valuation was not provided to Armanino, it was provided to Abe. (*See* FAC ¶ 86.) In addition, Abe was aware that OTB was negotiating an acquisition premised on a $100 valuation, even if he did not have the Rothschild Valuations, which in any event all reflected a $100 million valuation. (*Id.* ¶¶ 45–48, 57–58, 173.)

In his Opposition, Abe contends that, when read holistically, his allegations create a "strong inference of scienter that is at least as compelling as any other contrary inference." (Opp'n 20.) However, Abe fails to explain what allegations specifically give rise to the inference of scienter. *See City of Dearborn Heights*, 856 F.3d at 620 (quoting *Tellabs, Inc.*, 551 U.S. at 324) ("[A] strong inference of scienter must be 'at least as compelling as any opposing inference one could draw from the facts alleged.'"). Although Abe alleges that Amiri falsely represented that AFCH had provided Armanino with all information material to their valuation, he does not allege facts supporting that Amiri acted "intentionally or with deliberate recklessness." *See Zucco Partners*, 552 F.3d at 991; (FAC ¶ 156). Without more, Abe's allegations fail to establish a strong inference of scienter that is at least compelling as the nonculpable opposing inference.

For these reasons, the FAC does not sufficiently allege scienter and Claim One fails on this ground.

**B.     Claim Two: Violations of Section 20(a) of the Exchange Act**

Defendants also move to dismiss Claim Two against Amiri because control person liability is derivative of Claim One. (*See* Mot. 31.) A claim under Section 20(a) is dependent on a primary violation of § 10(b) or Rule 10b-5. *Zucco Partners*, 552 F.3d at 990. As the Court finds the FAC fails to sufficiently plead a violation of § 10(b) or Rule 10b-5, Claim Two against Amiri fails as well.

**C.     Leave to Amend**

Generally, a court should freely give leave to amend a dismissed complaint. *See* Fed. R. Civ. P. 15(a); *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) ("[This] is especially important in the context of the PSLRA . . . [where] an unprecedented degree of specificity" is required.). As the Court cannot conclude that any amendment would be futile, it **GRANTS** Abe leave to amend to cure the deficiencies identified above. However, as the Court has previously noted, Abe must allege a cogent and compelling, strong inference of scienter to survive

another motion to dismiss. Failure in this regard will be considered an inability to state a claim.

## V.  CONCLUSION

For the reasons discussed above, the Court **GRANTS** Defendants' Motion to Dismiss **with leave to amend**. (ECF No. 40.) Abe may file an amended complaint addressing the deficiencies identified above within twenty-one (21) days of the date of this Order. If Abe files an amended complaint, Defendants must file their response in accordance with Rule 15(a)(3).

**IT IS SO ORDERED.**

January 18, 2022

_____
OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE